IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Maria B. G.,[1] | ) | C/A No.: 1:24-3663-BHH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND |
| Leland Dudek,[2] | ) | RECOMMENDATION |
| Acting Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned

_____

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Leland Dudek was appointed as Acting Commissioner on February 18, 2025. Pursuant to Fed. R. Civ. P. 25(d), he is substituted as a party to this action.

recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.     Relevant Background

    A.     Procedural History

On November 7, 2017, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on May 31, 2016. Tr. at 159, 254–56, 257–58. Her applications were denied initially and upon reconsideration. Tr. at 177–81, 182–85, 188–92, 183–97. On February 5, 2019, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Tammy Georgian. Tr. at 59–103 (Hr'g Tr.). The ALJ issued an unfavorable decision on May 17, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 16–32. On April 27, 2020, the Appeals Council denied Plaintiff's request for review. Tr. at 1–7. Thereafter, Plaintiff filed a complaint in this court. Tr. at 780–89. On March 2, 2021, the court issued an order granting the Commissioner's motion to remand the case pursuant to sentence four of 42 U.S.C. § 405(g). Tr. at 790–91.

Plaintiff participated in a second hearing before the ALJ by telephone on September 23, 2021. Tr. at 717–53. The ALJ issued another unfavorable decision on October 20, 2021. Tr. at 692–716. On May 12, 2022, the Appeals Council denied Plaintiff's request for review. Tr. at 683–89. Plaintiff subsequently filed a second civil action seeking judicial review of the

Commissioner's decision on July 14, 2022. Tr. at 1328. On April 3, 2023, the court issued an order reversing the Commissioner's decision and remanding the case pursuant to sentence four of 42 U.S.C. § 405(g). Tr. at 1326–1401. The Appeals Council subsequently issued an order remanding the case to an ALJ on June 13, 2023. Tr. at 1402–06.

Plaintiff appeared before Administrative Law Judge ("ALJ") Richard LaFata for a third hearing on December 12, 2023. Tr. at 1223–94 (Hr'g Tr.). The ALJ issued a partially favorable decision on April 8, 2024, finding that Plaintiff was not disabled prior to June 12, 2022, but became disabled on that date. Tr. at 1184–1222. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on June 24, 2024. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was born in June 1967 and was 50 years old on her date last insured. Tr. at 104. She successfully completed the general educational development ("GED") tests, earning a high school equivalency certificate. Tr. at 68. Her past relevant work ("PRW") was as a waitress, a cook's helper, and a gambling card dealer. Tr. at 96. She alleges she has been unable to work since May 31, 2016. Tr. at 257.

2.     Medical History[3]

On June 1, 2016, Plaintiff presented to Doctors Care, after slipping and falling at work the prior day. Tr. at 336. She complained of pain on the right side of her lower back and in her left knee. *Id.* Michael Nirenstein, M.D. ("Dr. Nirenstein"), noted diminished range of motion ("ROM") of Plaintiff's left knee and lumbar spine, tenderness over the lateral left knee joint, spinous process tenderness at L4, L5, and S1, and hypertonicity of the erector spinae muscles bilaterally. Tr. at 337–38. X-rays of Plaintiff's lumbar spine and left knee demonstrated no acute fractures. Tr. at 338. Dr. Nirenstein assessed a contusion of the left knee and a lumbar sprain. *Id.*

Plaintiff returned to Doctors Care on June 7, 2016. Tr. at 340. She reported no improvement in her lower back and 40% improvement to her left knee. *Id.* Robert Williams, D.O. ("Dr. Williams"), stated Plaintiff was very guarded, moved very slowly, and winced in pain before he even touched her. *Id.* He noted: "Her SUBJECTIVE symptoms seem to far outweigh her OBJECTIVE findings." *Id.* He observed Plaintiff to be anxious and in moderate distress and to demonstrate tenderness of the coccyx and diminished and painful ROM in all three planes of the lumbar spine. Tr. at 341–42. He indicated Plaintiff's pain was isolated to the sacrum. Tr. at 342.

---

[3] Parts of Plaintiff's medical history have been recited from the court's order dated April 3, 2023 in C/A No. 1:22-2253-SVH.

He stated Plaintiff was very tender to palpation of the faint ecchymosis of the left tibial shelf down to the tibial tuberosity. *Id.* Dr. Williams replaced Naproxen with a Prednisone taper and provided a five-hour maximum restriction on a return-to-work form, as Plaintiff was upset by the prospect of working a double-shift and her regular shifts were five hours long. *Id.*

Plaintiff returned to Doctors Care on June 13, 2016, and reported only modest improvement with continued pain in the sacrum and right hip greater trochanteric region. Tr. at 344. She denied problems with her left knee and numbness, tingling, and radiation down her leg. *Id.* Michael Varney, M.D. ("Dr. Varney"), observed Plaintiff to demonstrate a slow and deliberate gait, tenderness to the sacrum, coccyx, and right greater trochanter, and negative straight-leg raising ("SLR") test. Tr. at 344. He assessed lumbar sprain, bursitis of the right hip, and contusion to the sacral region, referred Plaintiff to physical therapy, and wrote a note restricting her to sedentary work in five-hour shifts. Tr. at 346.

On June 17, 2016, Plaintiff reported doing "fair" when taking Zanaflex, but indicated it was too sedating to allow her to function outside her home. Tr. at 347. Dr. Varney noted more pain with flexion and extension than rotation of Plaintiff's right hip, tenderness over the right greater trochanter, right-sided tenderness into the sacroiliac region of the lumbar spine, deliberate gait favoring the right leg, tenderness of the coccyx and sacrum,

and negative bilateral SLR test. Tr. at 348–49. He instructed Plaintiff to take Zanaflex at bedtime, finish Prednisone, and then start Mobic 15 mg. Tr. at 349. Dr. Varney referred Plaintiff to an orthopedist on June 27, 2016. Tr. at 352.

Plaintiff participated in physical therapy from June 23 to October 25, 2016. Tr. at 365–406. During the initial evaluation, the physical therapist observed reduced ROM of the lumbar spine and decreased strength with right hip flexion, knee extension, ankle movements and right big toe extension. Tr. at 366.

On July 15, 2016, Wayne Bauerle, M.D. ("Dr. Bauerle"), observed antalgic gait on the right, mild discomfort with right hip flexion and rotation, paralumbar muscle tenderness, and restricted ROM of the lumbar spine in multiple planes. Tr. at 474. He ordered magnetic resonance imaging ("MRI") of the lumbar spine and pelvis. *Id.*

On July 22, 2016, an MRI of Plaintiff's lumbar spine showed a central annular tear and circumferential disc bulge at the L4–5 level. Tr. at 479.

On July 27, 2016, Dr. Bauerle noted the MRI of Plaintiff's lumbar spine showed mild degenerative changes at L4–5, no stenosis, and no nerve root compression and the MRI of her pelvis and sacrum revealed no acute abnormalities. Tr. at 472. He authorized Plaintiff to return to work with a 10-pound lifting restriction. *Id.*

6

Dr. Bauerle referred Plaintiff for work hardening on September 12, 2016. Tr. at 470. He indicated Plaintiff should continue light duty with a 10-pound lifting restriction. *Id.*

Plaintiff underwent a work conditioning evaluation on September 22, 2016. Tr. at 392–93. She demonstrated the following ROM of the lumbar spine: flexion to 60 degrees, extension to 10 degrees, right side-bend to 30 degrees, left side-bend to 32 degrees, right rotation to 25 degrees, and left rotation to 25 degrees. Tr. at 392. She demonstrated normal strength in her cervical myotomes and her left side, except for 4+/5 strength to L2–3 hip flexion. *Id.* Her myotome strength on the right was as follows: 3+/5 to L2–3 hip flexion; 4-/5 to L3–4 knee extension, 4+/5 to L4 ankle dorsiflexion and L5 great toe extension; and 5/5 to L5–S2 toe walk and T1 digital adduction and abduction. *Id.* She was unable to push and pull any weight and performed a five-pound 50-foot box carry and a seven-pound 50-foot tray carry. *Id.* The physical therapist recommended Plaintiff participate in work conditioning/hardening three times a week over four weeks to return to her prior level of work-related functioning. Tr. at 393.

On October 11, 2016, Plaintiff indicated she could sustain activities for 30 minutes at a time, but experienced low back pain upon doing so. Tr. at 398. The physical therapist observed Plaintiff to demonstrate reduced strength in the lower extremities, to lift and carry eight pounds, to push and

pull 15 pounds, and to perform activities slowly due to increased pain and apprehension. *Id.* He indicated Plaintiff had demonstrated improved ROM, strength, and aerobic capacity and was motivated to complete work conditioning. *Id.*

On October 24, 2016, physical therapist Mike Miller indicated Plaintiff had "reached a plateau in strength, ROM, [and] functional capacity" and was very limited in her therapeutic exercise progression due to increased low back pain. Tr. at 406. He stated Plaintiff demonstrated ability to push and pull 15 pounds, lift and carry eight pounds, and lift two pounds overhead for three minutes. *Id.* He stated Plaintiff was very slow in performing activities due to increased pain and apprehension. *Id.* He recommended discharge due to Plaintiff reaching a plateau and failing to meet goals for increased functional and aerobic capacity. *Id.*

Dr. Bauerle referred Plaintiff to physical medicine and rehabilitation specialist Kimberly Cecchini-Purgavie, M.D. ("Dr. Cecchini-Purgavie"), on October 24, 2016. Tr. at 468.

Plaintiff presented to the emergency room ("ER") at McLeod Seacoast Hospital for back pain on December 31, 2016. Tr. at 411–24. Timothy Carr, M.D., noted reproducible lumbar pain and paralumbar and sacral musculature spasm, but negative SLR, symmetric and strong deep tendon reflexes, and no signs or symptoms of cauda equina syndrome. Tr. at 430. He

ordered intramuscular injections of Hydromorphone, Toradol, and Dexamethasone Sodium Phosphate, diagnosed displacement of lumbar intervertebral disc without myelopathy, and prescribed Tramadol 50 mg, ibuprofen 800 mg, Valium 5 mg, and Norco 5-325 mg. Tr. at 414, 425, 433.

On January 16, 2017, Plaintiff described right-sided lower back pain that caused numbness in her right heel and radiation down her right leg. Tr. at 465. She stated her symptoms were aggravated by bending, squatting, and transitioning from sitting to standing. *Id.* She endorsed difficulties concentrating, remembering, or making decisions, walking or climbing stairs, dressing or bathing, and doing errands alone. *Id.* Dr. Cecchini-Purgavie noted Plaintiff had normal gait, no limp, and ambulated without an assistive device. *Id.* She observed tenderness to Plaintiff's paraspinal and iliolumbar regions and pain to palpation of the gluteal region. Tr. at 466. She noted 5/5 motor strength, absent bilateral plantar reflexes, normal bilateral ankle and knee reflexes, normal sensation, negative bilateral compression tests, negative bilateral Patrick-Fabere tests, negative bilateral seated SLR tests, and no clonus of the ankles/knees. *Id.* She assessed degeneration of lumbar intervertebral disc and recommended Plaintiff be evaluated by a pain management physician and undergo a functional capacity evaluation. *Id.* She advised Plaintiff and her daughter that Plaintiff's symptoms and physical exam were inconsistent with the MRI results. *Id.*

Plaintiff initiated treatment with pain medicine specialist Stephen Q. Parker, M.D. ("Dr. Parker"), on March 7, 2017. Tr. at 482. She described her pain as aching, burning, deep, discomforting, and sharp and located in her lower back, gluteal area, right flank, and legs. Tr. at 483. She rated it as a nine on a 10-point severity scale. *Id.* Dr. Parker noted pain to the left sacroiliac joint; positive Patrick/FABER sign on the right; antalgic gait; increased lower extremity ("LE") muscle tone; increased muscle tone in the lumbar spine; lumbar spasm; paraspinous tenderness; pain with motion; pain in the right greater trochanter; limited active ROM of the lumbar spine; maximum tenderness to the right hip; decreased active ROM of the hips; pain with ROM of the left knee; and decreased left knee strength. Tr. at 485. He ordered an MRI of the lumbar spine and prescribed Norco 10-325 mg and Gabapentin 300 mg. Tr. at 482, 486.

On March 24, 2017, Plaintiff rated her pain as a one to two and reported the medications and topical patches were working well and allowing her to walk and perform her activities of daily living ("ADLs"). Tr. at 490. Dr. Parker indicated he was awaiting approval for Plaintiff to undergo an MRI of the lumbar spine and would keep her out of work for one month. Tr. at 490. He refilled Plaintiff's medications. *Id.*

On April 4, 2017, Plaintiff rated her pain as a seven. Tr. at 494. Dr. Parker reviewed the MRI and indicated it showed a herniated nucleus

pulposus at L4–5 on the left. *Id.* He planned to schedule Plaintiff for lumbar epidural steroid injections ("ESIs"). *Id.*

Plaintiff rated her pain as a 10 on April 25, 2017. Tr. at 498. She indicated her medication was generally effective, but her symptoms had been exacerbated by the weather. *Id.* She reported generalized weakness, difficulty walking, paresthesia, gait disturbance, anxiety, and muscle weakness. Tr. at 499. Dr. Parker continued Plaintiff's medications and prescribed a compound cream. Tr. at 498.

On May 22, 2017, Dr. Parker administered transforaminal ESIs at Plaintiff's left L4 and L5 areas. Tr. at 502. The following day, Plaintiff reported about 30% improvement, but a lot of spasms. Tr. at 504. She demonstrated positive SLR on the right, antalgic gait, increased muscle tone in the spine and LE, lumbar spasm, paraspinous tenderness, and limited active ROM of the lumbar spine. Tr. at 506.

On June 20, 2017, Plaintiff presented to Dr. Parker for refills. Tr. at 509. She indicated her medication treatment plan was working well, although she rated her pain as an eight and indicated difficulty performing ADLs and household chores. *Id.* Dr. Parker continued medication management. *Id.*

Plaintiff rated her pain as a nine on July 18, 2017. Tr. at 513. Dr. Parker continued medication management, prescribed a compound cream,

and noted a second ESI had been approved. *Id.* He administered transforaminal ESIs at Plaintiff's left L4 and L5 levels on July 31, 2017. Tr. at 518–19.

On August 15, 2017, Plaintiff reported the ESIs had provided no relief and had caused severe headaches and right calf cramps. Tr. at 521. Dr. Parker indicated he would refer Plaintiff for a surgical consultation. *Id.*

On September 26, 2017, Plaintiff reported her medications were helping, but continued to rate her pain as a seven. Tr. at 524. Dr. Parker reduced Norco to twice a day. *Id.*

Plaintiff presented to Todd D. Cook, M.D. ("Dr. Cook"), for a surgical consultation on October 5, 2017. Tr. at 529. X-rays of Plaintiff's lower spine showed mild facet arthrosis, but were otherwise unremarkable. *Id.* Dr. Cook noted normal gait, normal LE muscle tone, absent spasm, negative SLR, normal reflexes, and normal active and passive ROM of the hips, knees, and ankles. Tr. at 532. He recorded normal LE strength, except for 3/5 strength to right ankle dorsiflexion. Tr. at 532–33. He informed Plaintiff that her imaging and response to injections suggested decompression or fusion surgery would provide no relief from her radicular symptoms. Tr. at 529. He advised Plaintiff that a spinal cord stimulator might help her chronic leg symptoms. *Id.*

Plaintiff reported increased pain and decreased functioning on October 17, 2017. Tr. at 534. Dr. Parker refilled Plaintiff's medications and indicated he would request a second surgical opinion. *Id.*

On November 21, 2017, Plaintiff indicated her pain was worsening. Tr. at 551, 552. Despite rating her pain as a nine, Plaintiff reported her medications were working well and allowing her to better function with ADLs. Tr. at 551. Dr. Parker continued Plaintiff's medications. *Id.*

Plaintiff complained of increased right leg pain and weakness in her right hand on December 19, 2017. Tr. at 556. She rated her pain as an eight, despite indicating her medication treatment plan was working well and allowing her to better function with ADLs. *Id.* Dr. Parker continued medication management. *Id.*

On January 16, 2018, Plaintiff rated her pain as a seven, despite reporting her medication treatment plan was working well and allowing her to better function with her ADLs. Tr. at 560. Dr. Parker refilled Plaintiff's medications. *Id.*

On February 6, 2018, Plaintiff reported her medications were working well and allowing her to function better with ADLs. Tr. at 590. Dr. Parker continued Plaintiff's medications and recommended she follow up with a dermatologist for complaints of itching and hives. *Id.*

Plaintiff presented to June Bartell Jones, M.D. ("Dr. Jones"), for an orthopedic consultative exam on February 19, 2018. Tr. at 567. Dr. Jones observed 4/5 muscle strength in the proximal and distal muscle groups in the upper extremities, 3/5 strength in the proximal and distal muscle groups of the right LE ("RLE"), and 4/5 strength in the proximal and distal muscle groups of the left LE ("LLE"). Tr. at 572. She stated Plaintiff had normal sensation in her upper extremities and LLE to light touch, pinprick, and vibration and normal sensation in her RLE to light touch and vibration. *Id.* However, she found decreased sensation to pinprick in the RLE, particularly in the L5 and S1 distribution. *Id.* She noted Plaintiff's inability to bend at the knee or flex at the hip to raise her right leg, lack of power to dorsiflex or plantar flex at her right ankle, inability to lift her right foot when walking, and dragging of her right foot. *Id.* She recorded the following reduced ROM: cervical flexion to 30/50 degrees; cervical extension to 50/60 degrees; cervical lateral flexion to 30/45 degrees on the left and 35/45 degrees on the right; cervical rotation to 40/80 degrees; lumbar flexion to 40/90 degrees; lumbar extension to 0/25 degrees; left lateral lumbar flexion to 15/25 degrees; right lateral lumbar flexion to less than 5/25 degrees; right knee flexion to 40/150 degrees in the supine position; right hip abduction to 20/40 degrees; right hip adduction to 10/20 degrees; right hip flexion to 60/100 degrees; internal rotation of the right hip to less than 10/40 degrees; external rotation of the

14

right hip to 30/50 degrees; right ankle dorsiflexion to 0/20 degrees; right ankle plantar flexion to less than 10/40 degrees; and right ankle sitting SLR to 30/90 degrees. Tr. at 567. She indicated Plaintiff demonstrated normal fine and gross manipulation and 4/5 grip strength in the bilateral hands. Tr. at 568. She stated Plaintiff had a slow, antalgic gait, required assistance to get on and off the exam table, had difficulty lifting her right toes and heel off the ground, could not squat, had difficulty lifting her right knee, and could not toe, heel, or tandem walk. Tr. at 573. She noted Plaintiff's right ankle Achilles tendon reflex was diminished to 1+. *Id.* Dr. Jones opined that Plaintiff's lower back injury had compressed L5 and S1 in the RLE. *Id.* She indicated there might be other nerve root compression or spinal fractures not seen at L3 or L4, given Plaintiff's inability to raise or flex her right knee. *Id.* She felt the MRI did not "reveal the entire picture that [was] seen in the physical exam" and stated Plaintiff would "need to be scheduled for a surgical procedure when seen by the neurosurgeon." *Id.*

On March 13, 2018, Plaintiff rated her pain as a seven, but indicated her medications continued to be effective and allowed her to function better with ADLs. Tr. at 592. Dr. Parker refilled Plaintiff's medications. *Id.*

Plaintiff presented to neurosurgeon Joseph T. Cheatle, M.D. ("Dr. Cheatle"), on March 21, 2018. Tr. at 579. She reported lumbar pain associated with reduced sensation, weakness, and radiculopathy to the RLE,

as well as recent onset right upper extremity weakness and radiculopathy. *Id.* Dr. Cheatle observed Plaintiff to have good musculoskeletal ROM, good muscle tone and strength, 4/5 right upper extremity strength, and decreased sensation in the RLE, as compared to the LLE. Tr. at 580. He indicated Plaintiff demonstrated a steady gait without assistance, although she was walking with a cane. *Id.* He assessed cervical radicular pain and acute right-sided low back pain with right-sided sciatica and referred Plaintiff for an MRI of her cervical spine. *Id.*

On April 2, 2018, state agency medical consultant Stephen Worsham, M.D., assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally push and/or pull with the RLE; never crawl or climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and climb ramps and stairs; and avoid even moderate exposure to hazards. Tr. at 116–19, 134–37.

On April 10, 2018, Dr. Parker observed Plaintiff to be ambulating with a cane due to weakness in her legs. Tr. at 595. Plaintiff rated her pain as an eight, despite reporting her medications were working well and allowing her to better function in ADLs. *Id.* Dr Parker refilled Plaintiff's medications. *Id.*

On April 13, 2018, an MRI of Plaintiff's cervical spine showed degenerative disc disease ("DDD"), most pronounced at C3–4, with moderate narrowing of the spinal canal and disc protrusion to the left of midline. Tr. at 578.

Plaintiff endorsed worsening problems and rated her pain as an eight on May 8, 2018. Tr. at 598. However, she also indicated her medication treatment plan was working well and allowing her to better function in ADLs. *Id.* Dr. Parker refilled Plaintiff's medications, prescribed Kenalog cream and Flonase nasal spray for her allergic reaction to the pain patches, and instructed her to discontinue use of the patches for one to two weeks. *Id.*

Plaintiff followed up with Dr. Cheatle to discuss the MRI results on May 10, 2018. Tr. at 587. She reported numbness in her right hand and leg. *Id.* Dr. Cheatle stated the MRI showed some minimal degenerative changes without significant stenosis. *Id.* He noted the MRI results were inconsistent with Plaintiff's reported symptoms and ordered electromyography ("EMG") and nerve conduction studies ("NCS") of her right upper and lower extremities. Tr. at 588.

Plaintiff rated her pain as an eight on June 5, 2018, despite reporting that her medication treatment plan was working well and allowing her to better function with her ADLs. Tr. at 602. Dr. Parker continued her medications. *Id.*

17

On June 22, 2018, a second state agency medical consultant, Hurley W. Knott, M.D., assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently balance, kneel, crouch, crawl, and climb ramps and stairs; occasionally stoop and climb ladders, ropes, and scaffolds; avoid concentrated exposure to extreme cold; and avoid even moderate exposure to hazards. Tr. at 153–56, 170–74.

On July 3, 2018, Plaintiff described numbness, tingling, and pain across her right wrist crease, numbness in the palm of her hand, weakness with grasping objects, neck pain, and gluteal pain that radiated to the anterior surface of the right hip and knee area. Tr. at 640. Dr. Cecchini-Purgavie observed normal findings, aside from positive Tinel's sign at the right median nerve and ambulation with limp, antalgic gait, and use of a cane. Tr. at 641. She administered EMG and NCS of the right upper and lower extremities that showed mild median neuropathy at Plaintiff's right wrist, affecting the sensory NCS only. *Id.* Dr. Cecchini-Purgavie stated it appeared to be demyelinating, but not axonal in nature and was consistent with mild carpal tunnel syndrome. *Id.* EMG and NCS of the RLE were normal. *Id.*

Plaintiff reported her medication plan was working well and allowing her to function better with ADLs on July 3, 2018. Tr. at 646. Dr. Parker continued Plaintiff's medications. *Id.*

On July 31, 2018, Plaintiff rated her pain as a six and worsening, but indicated her medication was working well and allowing her to better function with ADLs. Tr. at 649.

On August 28, 2018, Plaintiff rated her pain as a nine plus and indicated she was receiving no relief from her medications. Tr. at 656. Dr. Parker noted tenderness and decreased ROM to Plaintiff's lumbar spine, but otherwise normal findings. Tr at 654–55. He refilled Norco 10-325 mg three times a day, Gabapentin 300 mg three times a day, and Flonase and ordered a new MRI of Plaintiff's lumbar spine. Tr. at 656.

On September 22, 2018, an MRI of Plaintiff's lumbar spine showed a protrusion at L4–5 that projected into the spinal canal and closely approximated the transiting L5 nerve root, more so on the left than the right. Tr. at 609. It also indicated loss of the normal lumbar lordosis and a mildly transitional appearance at L5–S1. *Id.*

Dr. Parker discussed the MRI results with Plaintiff on September 25, 2018, and recommended a series of three bilateral ESIs at the L4–5 level. Tr. at 659.

On October 18, 2018, Dr. Parker administered transforaminal ESIs at Plaintiff's bilateral L4–5 levels. Tr. at 612. Plaintiff presented to the ER at McLeod Seacoast Hospital on October 20, 2018, after developing a fever, suprapubic pain, and difficulty urinating following the injections. Tr. at 623. The attending physician noted normal exam findings and lab studies, aside from slightly elevated white blood cell count. Tr. at 627. He ruled out cauda equina syndrome, urinary tract infection, and discitis and instructed Plaintiff to monitor her temperature and return if she developed additional symptoms. *Id.*

Plaintiff reported the ESIs provided 50% relief from her pain during a follow up visit on October 24, 2018. Tr. at 662. Dr. Parker administered additional bilateral ESIs on October 25 and November 1, 2018. Tr. at 1012.

Plaintiff continued to report good relief from the ESIs on November 27, 2018. Tr. at 665. Dr. Parker referred Plaintiff to physical therapy for strengthening and stabilization and advised her to perform home exercises twice a week. *Id.* He refilled Plaintiff's medications. *Id.*

Plaintiff participated in physical therapy from December 3, 2018, to January 25, 2019. Tr. at 951–73, 996–98. On December 14, 2018, Plaintiff complained of soreness in her lumbar spine and the lateral side of her right leg. Tr. at 960. The physical therapy assistant noted Plaintiff was doing well in treatment, but moved slowly, was unable to progress to SLR on the right,

had significant weakness to her RLE, and grimaced throughout the majority of treatment. *Id.*

On December 18, 2018, Plaintiff reported injections had provided some relief, but her symptoms had returned. Tr. at 968. Physical therapist Dale Gallo noted improved active ROM of Plaintiff's lumbar spine and on SLR, although her lumbar ROM and bilateral hip strength remained below normal. *Id.*

On December 27, 2018, Plaintiff reported good relief from the ESIs, but indicated she was continuing to experience radiating symptoms in her legs. Tr. at 667. Dr. Parker indicated he could provide no additional recommendations, planned to order a transcutaneous electric nerve stimulation ("TENS") unit, refilled Plaintiff's medications, and restricted her to light duty with no lifting greater than 10 pounds. Tr. at 668. He stated Plaintiff was at maximum medical improvement. *Id.*

Plaintiff reported her injections were "wearing off" during a physical therapy session on January 3, 2019. Tr. at 955. She complained of stiffness and pain in her tailbone. *Id.* The physical therapy assistant noted Plaintiff was able to perform activities and demonstrated increased motion despite grimacing in pain. *Id.*

Dr. Parker refilled Norco, Gabapentin, Lidopro, and Terocin and indicated he would order a TENS unit on January 29, 2019. Tr. at 1100.

Plaintiff reported being depressed and unable to vacuum and carry a laundry basket on January 15, 2019. Tr. at 951. The physical therapy assistant observed that Plaintiff had no improvement in ambulation and continued to ambulate with a significantly antalgic gait pattern. *Id.* She noted Plaintiff was unable to perform many therapeutic exercises due to pain. *Id.* She stated Plaintiff "cried in frustration" during the therapy session. *Id.*

Dr. Parker provided an opinion statement on January 25, 2019. Tr. at 671–75. He opined that Plaintiff could sit and stand for 20 to 30 minutes at a time; could stand for less than two hours in an eight-hour workday; could sit for about four hours in an eight-hour workday; would need to be allowed to walk for one to two minutes out of every five- to 10-minute period; would require a five- to 10-minute break every one to two hours; would need to elevate her legs at 90 degrees during periods of prolonged sitting for 25% of the workday; should rarely lift less than 10 pounds; should never lift 10 pounds or more; should never twist, stoop, crouch/squat, or climb ladders; would be off-task for 25% or more of the day; and would be absent from work on more than four days per month. *Id.* He stated Plaintiff's impairments were consistent with her symptoms and the functional limitations he identified. Tr. at 675.

On February 26, 2019, Plaintiff reported she was able to function slightly better with ADLs and had received some relief from the TENS unit.

Tr. at 1098. Dr. Parker refilled Norco and Gabapentin and gave Plaintiff a compound cream. *Id.* He again refilled Plaintiff's medications on March 26, 2019. Tr. at 1095.

On April 19, 2019, Dr. Parker reported Plaintiff had participated in physical therapy with mild improvement at first, received lumbar ESIs in November 2018 with only 50% relief, and indicated mild improvement with use of a TENS unit. Tr. at 1092. He stated Plaintiff had severe pain with difficulty ambulating and sitting. *Id.* However, he noted Plaintiff stated her current medication plan was working well. *Id.* Dr. Parker refilled Norco, Lidopro, Terocin patches, and Gabapentin during the visit and during a follow up on May 22, 2019. Tr. at 1090, 1092.

On June 25, 2019, Plaintiff endorsed muscle aches and weakness and joint and back pain. Tr. at 1001. She indicated the severity of her pain caused difficulty ambulating and sitting. Tr. at 1004. Dr. Parker assessed lumbosacral spondylosis with radiculopathy and continued Plaintiff on the same medications. *Id.*

On July 24, 2019, Plaintiff stated her medication treatment plan was working well and allowing her to function better with her ADLs. Tr. at 1007. Dr. Parker refilled Norco and Gabapentin. *Id.*

Plaintiff complained of severe spasms on August 21, 2019. Tr. at 1010. She stated her medication treatment plan was working well and allowing her

23

to function better with ADLs. *Id.* Dr. Parker refilled Norco and Gabapentin and prescribed Baclofen for muscle spasms. *Id.*

Plaintiff complained of bilateral leg cramping, worse on the left, on September 18, 2019. Tr. at 1012. She indicated her medication was working well and allowing her to better function with ADLs, except that Baclofen "made her see things." Tr. at 1013. Dr. Parker refilled Gabapentin and Norco and discontinued Baclofen. *Id.* He again refilled the medication on October 16, November 19, and December 18, 2019, and January 16 and February 14, 2020. Tr. at 1016, 1018, 1020, 1022, 1024.

On March 12, 2020, Plaintiff reported she had recently undergone emergency gallbladder removal and had received a prescription for 18 Percocet pills to manage her post-operative pain. Tr. at 1027. Dr. Parker instructed Plaintiff that she should not accept medications from other providers, as it was a violation of her pain contract to do so. Tr. at 1027. Plaintiff reported her medications were working well and allowing her to better function with ADLs. *Id.* Dr. Parker refilled Norco and Gabapentin. *Id.*

Plaintiff continued to report her medication regimen was effective, and Dr. Parker refilled Norco and Gabapentin on April 9 and May 12, 2020. Tr. at 1030, 1033.

On June 11, 2020, Plaintiff complained of a bothersome burning sensation that radiated down her right leg. Tr. at 1036. Dr. Parker continued

Plaintiff on the same medications, but increased Gabapentin to four times a day. *Id.*

On July 9, 2020, Dr. Parker refilled Norco, but did not refill Gabapentin because Plaintiff reported she had enough pills. Tr. at 1039. Dr. Parker refilled Norco and Gabapentin on August 6, September 10, October 8, November 5, and December 3, 2020, and January 6, February 4, and March 4, 2021. Tr. at 1042, 1046, 1049, 1052, 1055, 1058, 1062, 1065. Plaintiff reported her medication treatment plan was working well and allowing her to better function with ADLs during each of these visits. *See id.*

On February 4, 2021, Plaintiff indicated her treatment plan was working well and helping her to better function with ADLs. Tr. at 1660. Dr. Parker observed tenderness and decreased ROM in some areas of the lumbar spine and normal motor strength and reflexes on exam. *Id.*

Plaintiff reported her medication treatment plan was working well and allowing her to function better with ADLs on April 2, 2021. Tr. at 1068. Dr. Parker observed Plaintiff to present to the visit without a cane. *Id.* He refilled Norco and Gabapentin. *Id.*

Plaintiff endorsed a radiating, burning sensation and increased left knee pain on May 5 and June 4, 2021. Tr. at 1647, 1651. She was ambulating without a cane during both visits. *Id.* Dr. Parker refilled Norco and

Gabapentin. *Id.* He referred Plaintiff to Dr. Bohan for her left knee on May 5, 2021. Tr. at 1651.

On July 2, 2021, physician assistant Timothy Montague-Smith ("PA Montague-Smith") noted Plaintiff presented without a cane. Tr. at 1644. He refilled Norco and Gabapentin. *Id.*

On July 8, 2021, family nurse practitioner Naomi Ferguson ("NP Ferguson") administered a depression screening. Tr. at 1740. Plaintiff's responses were consistent with severe depression. *Id.* NP Ferguson also administered an anxiety screening, and Plaintiff's responses indicated severe anxiety. Tr. at 1740–41. NP Ferguson observed Plaintiff to be cooperative with the exam and to demonstrate good eye contact and a goal-directed and logical thought process. Tr. at 1741.

Plaintiff presented for pain management without a cane on August 4, 2021. Tr. at 1642. Dr. Parker refilled Zanaflex, Norco, and Gabapentin. *Id.*

Plaintiff presented to the ER at Grand Strand Regional Medical Center on August 6, 2021, with chest pain and shortness of breath. Tr. at 1163. She stated the symptoms had begun two weeks prior and had progressively worsened. Tr. at 1167. She described waking during the night and gasping for air. *Id.* The attending physician noted tenderness to palpation over the sternum, but otherwise normal findings. Tr. at 1169. An electrocardiogram and lab studies were normal. Tr. at 1169–70. The attending physician

26

indicated Plaintiff likely had costochondritis and discharged her to follow up with Rogers S. Walker, Sr., M.D. ("Dr. Walker"), in three to five days. Tr. at 1170, 1171.

Plaintiff followed up with physician assistant Shelley Gilbert ("PA Gilbert") in Dr. Walker's office on August 10, 2021. Tr. at 1175. PA Gilbert recorded normal findings on physical exam, except for expiratory wheezes. Tr. at 1177. She assessed cough, nicotine dependence, shortness of breath, gastroesophageal reflux disease ("GERD"), and somnolence and prescribed Famotidine 20 mg. *Id.* She stated Plaintiff likely had some component of chronic obstructive pulmonary disease ("COPD"), but she was unable to order pulmonary function testing due to her "cash pay" status. *Id.* She advised Plaintiff to apply for medication assistance through a pharmaceutical company. *Id.*

Plaintiff participated in a home sleep test on August 19, 2021. Tr. at 1173. It showed mild sleep apnea, minimal snoring, no drops in oxygen saturation, and no arrhythmias. *Id.* Jeff Benjamin, M.D. ("Dr. Benjamin"), noted Plaintiff's mild sleep apnea qualified for continuous positive airway pressure ("CPAP"). *Id.*

On September 2, 2021, Plaintiff presented without a cane despite her complaints of a radiating, burning sensation running down her right leg and

increased pain in her left knee. Tr. at 1639. Dr. Parker refilled Zanaflex, Norco, and Gabapentin. *Id.*

Dr. Parker completed another medical source statement on September 2, 2021. Tr. at 1117–21. He stated he had seen Plaintiff monthly since March 7, 2017. Tr. at 1117. He identified her diagnosis as lumbar radiculopathy with LE weakness. *Id.* He indicated her prognosis was poor. *Id.* He noted Plaintiff's symptoms included pain to the low back, legs, and feet. *Id.* He stated Plaintiff experienced sharp pain to her low back and weakness and pain to her LEs upon walking. *Id.* He stated Plaintiff walked with an assistive device, as she presented a fall risk. *Id.* He explained an MRI had shown an annular tear with a disc bulge at the L4–5 level that was contacting the L5 nerve root on the left more than the right. *Id.* He stated Plaintiff was treated with chronic medications including Norco, Zanaflex, and Gabapentin for pain and spasms. *Id.* He noted Plaintiff's medications caused drowsiness and fatigue. *Id.* He stated Plaintiff could walk zero city blocks without rest or severe pain; sit for 10 minutes at one time; stand for five minutes at one time; sit for less than two hours in an eight-hour workday; stand/walk for less than two hours in an eight-hour workday; and walk no more than 10 to 15 feet without a cane. Tr. at 1117–18. He indicated that due to swelling and pain, Plaintiff's legs should be elevated at heart level with prolonged sitting. Tr. at 1119. He indicated Plaintiff was incapable of lifting

any weight, twisting, stooping/bending, crouching/squatting, climbing stairs, and climbing ladders. *Id.* He stated Plaintiff had significant limitations with reaching, handling, or fingering. Tr. at 1120. He noted Plaintiff was likely to be off task for 25% or more of a typical workday. *Id.* He stated Plaintiff was incapable of even "low stress" work. *Id.* He felt that Plaintiff's impairments, as demonstrated by signs, clinical findings, and laboratory or test results, were reasonably consistent with the symptoms and functional limitations described in the evaluation. Tr. at 1121. He noted Plaintiff had recently been diagnosed with COPD and sleep apnea and was taking antibiotics and using a CPAP machine. *Id.* He stated the symptoms and limitations he described were applicable in August 2017, at the earliest. *Id.*

Plaintiff endorsed a radiating, burning sensation in her right leg and pain her left knee, but ambulated without a cane on October 1 and 29 and December 1, 2021. Tr. at 1630, 1633, 1636. Dr. Parker refilled Zanaflex during the October visits and Norco and Gabapentin during all three visits. *Id.*

On December 29, 2021, physician assistant Brittany Hadden ("PA Hadden") noted Plaintiff ambulated with no assistive device despite a limp. Tr. at 1626. She observed tenderness and decreased ROM in Plaintiff's lumbar spine with normal motor strength and reflexes. Tr. at 1626–27. She refilled Norco and Gabapentin. Tr. at 1627.

Plaintiff reported left knee pain and was ambulating without a cane on January 28, February 25, and March 25, 2022. Tr. at 1615, 1619. Dr. Parker refilled Zanaflex at the January 28 visit and Norco and Gabapentin at all three visits. *Id.*

On April 11, 2022, Plaintiff presented to family nurse practitioner Dawn Coffin ("NP Coffin") complaining of dizziness and shakiness. Tr. at 1743. She suspected she might have diabetes. *Id.* NP Coffin assessed pre-diabetes based on a hemoglobin A1C level of 6.4%. Tr. at 1744. She continued Ventolin for COPD and instructed Plaintiff to follow a diabetic diet and to check her blood sugar once a day and maintain a log. Tr. at 1744–45.

Plaintiff complained of increased left knee pain on April 28, 2022. Tr. at 1611. She was ambulating without a cane. *Id.* Dr. Parker refilled Norco and Gabapentin. *Id.*

Plaintiff complained of a burning sensation radiating down into her right leg, as well as increased left knee pain on May 26, 2022. Tr. at 1602. PA Hadden noted Plaintiff was using a left knee brace, but no cane. *Id.* She refilled Norco and Gabapentin. *Id.* PA Hadden refilled Norco, Gabapentin, and Zanaflex on June 23, 2022. Tr. at 1603.

Plaintiff reported worsened right foot hypoesthesia, developing left foot hypoesthesia, and left knee pain and weakness that radiated to her left foot

on July 27, 2022. Tr. at 1599. Dr. Parker refilled Zanaflex, Norco, and Gabapentin and prescribed a Prednisone dose pack. *Id.*

On August 26, 2022, Plaintiff reported she was scheduled for surgery on September 9, 2022, for an abscessed tooth that had extended into her sinuses. Tr. at 1595. NP Hadden advised Plaintiff not to accept pain medication from any other provider and to contact her office if she required additional postoperative pain control. *Id.* She refilled Zanaflex, Norco, and Gabapentin. *Id.*

Dr. Parker refilled Zanaflex, Norco, and Gabapentin on September 23, 2022. Tr. at 1591. NP Hadden refilled Norco and Gabapentin on October 24, 2022. Tr. at 1587.

Plaintiff reported increased achiness in her joints due to the weather and was ambulating with a cane on November 21, 2022. Tr. at 1582. PA Hadden refilled Norco and Gabapentin. *Id.*

On December 20, 2022, Plaintiff complained of recurrent left knee and right thigh pain that was exacerbated by cold weather, worsening right foot hypoesthesia, and developing left foot hypoesthesia. Tr. at 1578. PA Montague-Smith refilled Zanaflex, Norco, and Gabapentin and prescribed a Prednisone dose pack to treat Plaintiff's pain exacerbation. *Id.*

On January 19, 2023, NP Hadden observed that Plaintiff ambulated with a cane. Tr. at 1574. She refilled Norco and Gabapentin. *Id.*

On February 15, 2023, Dr. Parker noted Plaintiff was ambulating with a cane. Tr. at 1569. He refilled Gabapentin, Norco, and Zanaflex. *Id.*

On April 17, 2023, Plaintiff reported she had just returned from her mother's funeral in the Philippines and felt tired and sore from traveling. Tr. at 1565. She complained of worsening right foot hypoesthesia and developing left foot hypoesthesia. *Id.* PA Hadden noted Plaintiff was ambulating with a cane. *Id.* She refilled Zanaflex, Gabapentin, and Norco. *Id.*

On May 15, 2023, Plaintiff complained of worsening right foot hypoesthesia and developing left foot hypoesthesia that was affecting her ADLs and anxiety attacks associated with grief following her mother's death. Tr. at 1560. PA Hadden noted Plaintiff was ambulating with a cane. *Id.* She provided a one-time prescription for Valium 5 mg for anxiety attacks and instructed Plaintiff to follow up with her primary care provider. *Id.* She also refilled Plaintiff's pain medications. *Id.*

On June 14, 2023, Plaintiff presented to Dr. Parker for medication refills. Tr. at 1555. She endorsed pain in her lumbar spine that caused difficulty with standing walking, weight bearing, shifting positions and climbing stairs and was associated with weakness, numbness, tingling, and swelling. *Id.* Dr. Parker noted Plaintiff was ambulating with a cane. Tr. at 1556. He continued Plaintiff's pain medications and encouraged her to follow up with her primary care provider for mental health medication. *Id.*

32

On July 28, 2023, Plaintiff presented to NP Coffin and reported three syncopal episodes over the prior two months. Tr. at 1754. She described chest pain lasting approximately two minutes that occurred after she had been active. *Id.* She also reported shortness of breath and fatigue over the prior six-month period. *Id.* Her responses on a depression screen were consistent with moderately-severe depression. *Id.* NP Coffin observed Plaintiff to be alert, oriented, and tearful with depressed mood. Tr. at 1755. She assessed near syncope, other chest pain, severe episode of recurrent major depressive disorder, and chronic fatigue, in addition to Plaintiff's chronic diagnoses. *Id.* She referred Plaintiff to a cardiologist and to a behavioral health provider and prescribed Paxil 10 mg. *Id.*

Plaintiff followed up with NP Coffin to discuss her depression and recent lab results on August 22, 2023. Tr. at 1758. She denied further syncopal episodes and said she had "changed her diet and been working on not over doing it with house work." *Id.* She said she had only taken Paxil once, as it made her tired. *Id.* She indicated her mood had been improved by caring for her grandson, although she continued to spend most of her time alone in her room. *Id.* NP Coffin changed Paxil to Prozac. *Id.*

On October 26, 2023, Plaintiff underwent a three-and-a-half-hour functional capacity evaluation ("FCE") at CORA Rehabilitation. Tr. at 1529–52. Her occasional lifting capability was consistent with work at the

sedentary exertional level. Tr. at 1529. She demonstrated the ability to lift five pounds in some positions on an occasional basis. Tr. at 1530. Her sitting was limited to frequent and her standing and walking were limited to occasional. *Id.* She required intermittent positional changes. *Id.* She could not kneel, low squat/crouch, or climb. *Id.* She could occasionally stoop and balance. *Id.* Plaintiff demonstrated deficits with prolonged sitting, prolonged standing, walking, balancing, squatting/crouching, climbing, kneeling, stooping, lower-level working, lifting, carrying, and pushing/pulling. *Id.* She also required the ability to perform frequent pain management techniques that included seated weight shift onto the left hip, standing weight shift onto the left lower extremity, use of upper extremity support and leaning on equipment while in standing positions, use of a back brace, and intermittent positional changes between sitting/standing/lying. *Id.* Physical therapist Amanda Milanak ("PT Milanak"), physical therapy assistant Joe Cifelli ("PTA Cifelli"), and Dr. Parker indicated Plaintiff's "frequent utilization of pain management techniques and positional limitations would place her at a reduced functional capacity." *Id.* They further noted Plaintiff's subjective reports and responses to a questionnaire were consistent with high pain focus/fear of pain. *Id.* They concluded Plaintiff was unable to complete the full range of sedentary work due to significant positional limitations to sitting, standing, walking, balancing, and working at lower levels. *Id.* They

considered the results of the evaluation to be a reliable indication of Plaintiff's true functional abilities, as she demonstrated consistent and maximal effort throughout the evaluation. Tr. at 1529.

On November 22, 2023, Dr. Parker wrote a letter in response to Plaintiff's attorney's request to clarify parts of his previous opinions. Tr. at 1730–32. He explained he was "board certified by the American Board of Physical Medicine and Rehabilitation" and his practice was "focused on pain management, physical medicine and rehabilitation as well as nonsurgical back, neck and spine care." Tr. at 1730. He noted he had served as Plaintiff's treating physician since March 7, 2017. *Id.* He addressed a reference on December 27, 2018, to a "light duty work note with no lifting greater than 10 pounds." *Id.* He stated he had agreed to provide such a note in response to Plaintiff's request to return to work despite his doubts that she would be able to return to work. *Id.* He indicated his ordering of a TENS unit on December 27, 2018, and the medications he was prescribing were inconsistent with Plaintiff being able to return to work in a 40-hour a week job. *Id.* He stated he had subsequently noted on January 29, 2019, that he would provide a work note for no lifting, but "knew she could not return to work" and "d[id] not believe that she has returned to work." *Id.*

Dr. Parker addressed Dr. Cecchini-Pergavie's statement that "she did not quite understand the reasons why [Plaintiff] was having such severe back

pain that radiated from the entire lumbar spine throughout the pelvis as well as in the right leg and right knee and that her 'physical exam did not match the MRIs.'" Tr. at 1731. He explained "MRIs do not measure pain," felt that Plaintiff's MRIs were consistent, and noted that while "[t]he disc bulge was resolving to some limited degree," it remained "enough to cause nerve protrusion, compressing the nerve root." *Id.* He stated Plaintiff's complaints of pain were consistent with the MRIs and the diagnosis he provided. *Id.*

He referenced Plaintiff's report of a 30% improvement in her pain one day following the LESI at L4 and L5 and indicated the temporary improvement was not unusual, although it was unusual that Plaintiff received no prolonged relief from the LESIs. *Id.*

Dr. Parker addressed his statements that Plaintiff's medications provided good relief and were helpful, but noted the medications only provided temporary relief and that Plaintiff's nerve pain without medication would not allow her to function. *Id.* He wrote: "When I say she gets some relief from the pain, it is not enough relief for her to be able to sit for any length of time, stand for more than a few minutes at a time, walk any distance without the assistance of a cane, and she is still off-balance." *Id.* He further noted there were times when Plaintiff had received no relief from her pain medications. *Id.*

Dr. Parker indicated he had recently referred Plaintiff for the FCE that showed her to be "little more than 'bed bound' at this time." *Id.* He stated "this accurately describes [Plaintiff] and I believe the FCE accurately reflects what [her] capacities were in 2017 through 2019 and continuing to this day." *Id.* He noted Plaintiff had "tried every medication and therapy [he] suggested" over their six-and-a-half-year treatment relationship. *Id.*

    C.    The Administrative Proceedings

        1.    The Administrative Hearings[4]

            a.    Plaintiff's Testimony

                i.    February 5, 2019

During the first hearing, Plaintiff testified she lived with her daughter, son-in-law, and one-year-old grandson. Tr. at 66. She said her daughter and son-in-law worked outside the home and her grandson attended daycare. Tr. at 67. She stated she received food stamps and workers' compensation payments. Tr. at 68. She admitted she had a driver's license and was able to drive. *Id.*

Plaintiff confirmed she last worked as a hostess, server, and busser at Bay Watch Hotel. Tr. at 69. She stated she had previously worked as a plate setter at Seafood Hut. *Id.* She indicated she had also worked for Ventures

---

[4] Testimony from the prior hearings is recited from the court's order dated April 3, 2023, in C/A No. 1:22-2253-SVH.

South Carolina and Southern Cruise Lines as a card dealer on casino boats. Tr. at 70.

Plaintiff testified she was unable to work because she experienced a lot of pain and would be unable to fulfill her job duties. *Id.* She said she had numbness in her toes and aching in her ankle, hips, and back. *Id.* She indicated her back pain caused her to "barely [be able to] walk straight" and to drag her feet while walking. *Id.* She explained she had been injured at work when she slipped on water and fell. Tr. at 71. She denied having any medical problems other than those related to her pain. *Id.* She said her doctor prescribed Norco, Gabapentin, a patch, and a cream for her pain. Tr. at 72.

Plaintiff testified that on a typical day, she woke up, warmed her coffee, returned to bed, went to the kitchen for a muffin, went back to bed, and took her medication. *Id.* She said that within an hour, she would get up, wash her cup, and go back to bed and watch television. *Id.* She indicated she would later get up, brush her teeth, shower, and go back to bed. Tr. at 73. She stated she could stand for 15 to 20 minutes to cook noodles and would take breaks if she cooked something more complicated. *Id.* She said she returned to bed after preparing food. *Id.* She denied performing household chores, other than washing her cup. Tr. at 74. She said she would lie on her side to play on the floor with her grandson. *Id.* She stated she was unable to lift him. *Id.*

Plaintiff admitted she had received injections that had provided relief for a month such that she could "walk and everything." *Id.* However, she indicated her pain returned after a month. *Id.* She said she had used a cane or walker prior to receiving injections, but she was currently using a back brace. Tr. at 74–75.

Plaintiff confirmed that she used to her phone to access the internet. Tr. at 75. She said she maintained contact with her family in the Philippines through Facebook. *Id.*

Plaintiff testified she was right-handed and was experiencing numbness in her right arm and hand. *Id.* She clarified that she could only lie on her left side because her pain was exacerbated by lying flat and on her right side. Tr. at 76. She said she could barely move. *Id.* She indicated she was unable to wear shoes with laces and had to sit to put on her pants. Tr. at 76, 77. She said she dropped items frequently and could not open a bottle of water due to numbness in her hands. Tr. at 77–78.

Plaintiff testified she could not vacuum because the vacuum cleaner was too heavy and caused her pain. Tr. at 78. She said she drove to pick up her medications, but experienced increased back pain while driving. *Id.* She indicated she could drive for half an hour. Tr. at 79. She stated she used her left foot to apply the brakes and her ankle to apply the gas because of pain on the side of her right foot. *Id.* She said she used an electric cart in the grocery

store if it was available and walked straight to the meat section if there was no electric cart available. Tr. at 80. She indicated she typically woke three times between 11 PM and 8 AM. Tr. at 80–81.

Plaintiff stated she experienced sharp pain in her back every day. Tr. at 82. She rated it as a seven, at best, with medication. *Id.* She said her pain was exacerbated by walking, sitting, and standing and relieved by lying on her side. *Id.* She indicated her medication affected her memory and made her drowsy. Tr. at 83. She said she felt depressed because she had lost her house and car, could not provide financial support to her family in the Philippines, and could not be the kind of grandmother she wanted to be. Tr. at 84.

Plaintiff confirmed she had recently received a TENS unit. *Id.* She said she used it three times a day and it provided some relief. Tr. at 85. She indicated the most recent injection had not helped. *Id.* She confirmed that she used a heating pad, a cream, and a patch, in addition to her medications and the TENS unit. *Id.*

Plaintiff estimated she could stand for 15 to 20 minutes and sit for 15 to 20 minutes prior to having to lie down. Tr. at 86. She said her pain would increase to a ten if she did not take Hydrocodone[5] and Gabapentin. Tr. at 87. She indicated her pain level did not drop below seven. *Id.* She said she could

---

[5] Plaintiff references Hydrocodone in her testimony. She is prescribed Norco, a combination of Hydrocodone and acetaminophen. *See, e.g.*, Tr. at 656, 1007, 1092, 1100.

40

walk as far as from the front of Food Lion to the meat section. Tr. at 88. She estimated she could lift and carry five to eight pounds. Tr. at 88, 89. She testified she would sometimes forget what she had planned to say during a conversation. Tr. at 89.

ii.     September 23, 2021

During the second hearing, Plaintiff testified she continued to live with her daughter, son-in-law, and three-year-old grandson. Tr. at 723. She confirmed that her grandson attended daycare on weekdays while his parents worked. *Id.*

Plaintiff testified her health had worsened since the prior hearing. Tr. at 724. She said she underwent surgical removal of her gallbladder during the prior year. *Id.* She stated she had been diagnosed with sleep apnea and COPD. *Id.* She indicated she spent most of the time in bed. *Id.* She rated her pain as an eight, despite taking Hydrocodone, Gabapentin, and a muscle relaxer. *Id.* She said she had not taken Hydrocodone prior to the hearing because it affected her ability to remember and understand. *Id.*

Plaintiff stated she no longer cooked and did not shower while she was alone because of impaired balance. *Id.* She noted her daughter had installed cameras in the house to monitor her because she had forgotten to turn off the faucet and the stove. Tr. at 725.

Plaintiff testified her pain had worsened since the prior hearing. *Id.* She described it as aching, stiffness, burning, and shooting from her back and hips to her legs and feet and causing numbness. *Id.*

Plaintiff noted her daughter would prepare her breakfast and medications prior to leaving for work and drop off her lunch during her lunch break. *Id.* She said she could not go to the bathroom or brush her teeth until her morning medications kicked in. *Id.* She stated a neighbor and friends would call to check on her during the day. *Id.* She indicated she would walk 20 feet to her porch and sit for no more than 30 minutes before returning to her room to use her breathing machine. Tr. at 726.

Plaintiff testified she took Hydrocodone, Gabapentin, and a muscle relaxer three times a day. Tr. at 727. She stated she had stopped smoking when she underwent gallbladder surgery. Tr. at 729.

### iii.    December 12, 2023

During the third hearing, Plaintiff testified she was 56 years old. Tr. at 1231. She stated she lived with her daughter, son-in-law and nearly six-year-old grandson. Tr. at 1233. She denied serving as a caregiver to her grandson. Tr. at 1234. She confirmed she had a driver's license, although she had not driven over the prior three months due to pain. Tr. at 1236. She said she had previously driven short distances to run errands near her home despite being limited by her physical conditions. Tr. at 1236–37. She indicated she had

pursued a workers' compensation claim approximately five years prior and had received a $98,0000 settlement. Tr. at 1237–38. She denied collecting unemployment, but confirmed her receipt of food stamps. Tr. at 1240.

Plaintiff denied using alcohol and illegal drugs. Tr. at 1241. She said she smoked a pack of cigarettes every four days. *Id.* She indicated she had not performed any volunteer or paid work or applied for any jobs since May 2016. Tr. at 1241–42.

Plaintiff testified she could not sit or stand for long periods. Tr. at 1238. She described numbness in her toe and aching from her ankle, through her leg, and to her back. *Id.* She stated she could not perform her PRW as a waitress because of pain, difficulty standing and walking, and a need to use a cane. Tr. at 1247–48. She indicated she first started using the cane four years prior and had been using a brace since her injury. Tr. at 1248.

Plaintiff estimated she could stand for 10 to 15 minutes before needing to sit for 10 minutes. Tr. at 1250. She stated she could walk for 10 minutes, although she might fall due to aching and numbness in her right foot and leg. Tr. at 1251. She indicated she had been able to lift 10 pounds when she stopped working in 2016, but her ability to lift had been reduced to five pounds since the prior year. Tr. at 1252–53. She clarified that she would not have been able to lift 10 pounds on a regular basis following her injury. Tr. at 1254. She said she used a riding cart in the grocery store. Tr. at 1259.

Plaintiff testified her daughter typically brought her coffee and a muffin each morning so she could take her medicine. Tr. at 1260. She indicated she would lie in bed for an hour or more prior to going to the bathroom and brushing her teeth and would subsequently return to the bed to lie down until lunchtime. Tr. at 1260–61. She stated her daughter provided lunch for her. Tr. at 1261. She said she spent most of the day in bed, either using her iPad or watching television. *Id.* She noted she sat on the porch for 10 to 20 minutes each day. Tr. at 1262. She clarified that her daughter took her to the store to shop. *Id.* She denied sitting in a recliner as sitting caused increased back pain and explained that she needed to lie down and prop up with many pillows on her leg and back. Tr. at 1263.

Plaintiff stated she had loved her job prior to her injury. *Id.* She explained she could not do laundry because it exacerbated her back pain to reach and lean over. Tr. at 1264. She rated her average pain as a seven on a 10-point scale with medications. *Id.* She indicated her pain was beyond a 10 if she did not take medication. *Id.*

Plaintiff described numbness in her toe and burning and aching in her ankle that radiated through her legs and knees to her back. Tr. at 1265. She confirmed that she had felt this pain since 2016. *Id.* She stated she took Gabapentin and Hydrocodone for pain and Sertraline for depression. Tr. at 1266. She stated her medication caused her difficulty processing

conversations. *Id.* She indicated she had started taking medication for depression two or three months prior. Tr. at 1267. She noted her doctor had recommended she see a counselor, but she could not afford to do so. Tr. at 1268. She said the medication for depression was helping. Tr. at 1269. She stated that if she did not take her medication, she felt sad, cried, and did not want to get up or do anything. Tr. at 1271. She indicated her sadness had increased when her mother passed away in April. Tr. at 1272. She said she had felt tired "all the time" for "[a] long time." *Id.* She noted she had developed memory problems when she started taking medication. *Id.*

b.     Vocational Expert Testimony

Vocational expert ("VE") Heaven Hollender, Ph.D., reviewed the record and testified at the hearing on December 12, 2023. Tr. at 1273–93. The ALJ informed the VE that Plaintiff's PRW had previously been classified as an informal waitress, *Dictionary of Occupational Titles* ("*DOT*") No. 311.477-030, requiring light exertion and a specific vocational preparation ("SVP") of 3, a gambling card dealer, *DOT* No. 343.464-010, requiring light exertion and an SVP of 5, and a cook's helper, *DOT* No. 318.687-010, requiring medium exertion and an SVP of 2. Tr. at 1230–31. The VE agreed with this classification of Plaintiff's PRW, although she stated Plaintiff's description suggested she performed the informal waitress job at the medium exertional level. Tr. at 1277. The ALJ described a hypothetical individual of Plaintiff's

vocational profile who could perform work at the light exertional level, occasionally push, pull, and operate foot controls with the RLE, occasionally reach overhead bilaterally, frequently reach in other directions, handle, finger, and feel, occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, occasionally balance, stoop, kneel, and crouch, never crawl, never work at unprotected heights, never operate a motor vehicle as an occupational requirement, avoid concentrated exposure to extreme cold, avoid concentrated exposure to tools and work processes that would expose the RLE to concentrated vibration, and with time off task accommodated by ordinary breaks. Tr. at 1278–79. The VE testified that the hypothetical individual would be able to perform Plaintiff's PRW as an informal waitress as generally performed. Tr. at 1279. She identified additional jobs at the light exertional level with an SVP of 2 as a routing clerk, *DOT* No. 222.587-038, a ticket taker, *DOT* No. 344.667-010, and a mail clerk, *DOT* No. 209.687-026, with 221,000, 89,200, and 59,400 positions in the national economy, respectively. Tr. at 1280.

As a second hypothetical question, the ALJ asked the VE to consider the individual previously described, but to further assume the individual would be limited to simple and routine tasks and simple work-related decisions. *Id.* He asked if the individual would still be able to perform the three additional jobs. *Id.* The VE testified the individual would be able to

perform jobs as a ticket taker and router, but the mail clerk job would be eliminated, as it required a reasoning level of 3. *Id.* She stated the individual would be able to perform a job as a bagger, *DOT* No. 920.687-018, with an SVP of 1 and 327,000 jobs in the national economy. Tr. at 1260–61. The VE confirmed that the informal waitress job would be eliminated. Tr. at 1281.

For a third hypothetical question, the ALJ asked the VE to consider the person described in the first question and to further assume the individual would be limited to standing and walking for no greater than four hours in an eight-hour day. Tr. at 1282. The VE confirmed the additional restriction would eliminate Plaintiff's PRW as an informal waitress, as well as the availability of light work in significant numbers. Tr. at 1282–83.

As a fourth hypothetical question, the ALJ asked the VE to consider only that the hypothetical individual described in the first question would require the use of a handheld assistive device such as a cane for prolonged ambulation, ascending or descending slopes, and traversing on uneven terrain. Tr. at 1283. The ALJ asked if the individual would be able to perform work as an informal waitress. *Id.* The VE testified the individual would not. *Id.* The ALJ asked if the individual would be able to perform the other jobs identified in response to the prior questions. *Id.* The VE testified the individual would be able to perform those jobs, provided she was able to lift and carry up to 20 pounds in the non-dominant hand. Tr. at 1283–84.

For a fifth hypothetical question, the ALJ asked the VE to consider that the individual would require a sit/stand option, defined as a brief postural change at or near the workstation no more frequently than up to twice an hour for a duration of time no greater than up to five minutes each. Tr. at 1284. The ALJ asked if the restriction would eliminate work as an informal waitress. *Id.* The VE confirmed it would. *Id.* The ALJ asked if the individual would still be able to perform the other jobs the VE identified. *Id.* The VE stated the individual would be able to perform those jobs, provided she remained on task while alternating positions, although the number of bagger jobs would be reduced by 50%. Tr. at 1284–85.

The ALJ asked the VE whether any skills from Plaintiff's PRW transferred to other work at the light exertional level. Tr. at 1285. The VE testified none of the skills Plaintiff acquired in her PRW would be transferrable. *Id.*

As a sixth hypothetical question, the ALJ asked the VE to consider the restrictions included in the first question, but to further consider that the individual would be limited to sedentary work. Tr. at 1285–86. The VE confirmed that all of Plaintiff's PRW would be eliminated. Tr. at 1286. The ALJ asked the VE to provide jobs that could be performed by an individual with the RFC described. *Id.* The VE testified the individual would be able to perform sedentary work with an SVP of 2 as a final assembler, *DOT* No.

48

713.687-018, a call-out operator, *DOT* No. 237.367-014, and an information clerk, *DOT* No. 237.367-046, with 26,100, 15,600, and 93,200 jobs in the national economy, respectively. *Id.*

For a seventh hypothetical question, the ALJ asked the VE to consider that the individual described in the prior question would be limited to simple and routine tasks and simple work-related decisions. *Id.* The ALJ asked if the jobs identified in response to the prior question would remain. Tr. at 1286–87. The VE testified the job of final assembler would remain and the other two jobs would be eliminated, although the individual would be able to perform additional jobs at the sedentary exertional level with an SVP of 2 as an addresser, *DOT* No. 209.587-010, and a sorter, *DOT* No. 521.687-086, with 39,800 and 12,800 positions in the national economy, respectively. Tr. at 1287.

As an eighth hypothetical question, the ALJ asked the VE to consider the individual described in the sixth question, and to further assume the individual would require a sit/stand option. *Id.* The VE testified the individual would be able to perform the jobs identified at the sedentary exertional level, but that the number of available jobs would be reduced by 50%. *Id.*

For a ninth hypothetical question, the ALJ asked the VE to consider the individual described in the sixth question who would require the use of a

hand-held assistive device as described in question four. Tr. at 1288. The VE testified the individual would be able to perform the jobs identified at the sedentary exertional level, provided she could carry up to 10 pounds in her non-dominant hand. *Id.*

As a tenth hypothetical question, the ALJ asked the VE to consider the individual described in the sixth question and to assume she would be able to stand and/or walk for no greater than one hour in an eight-hour day. Tr. at 1289. The ALJ asked the VE if this restriction would eliminate work at the sedentary exertional level. *Id.* The VE stated it would. *Id.*

The VE confirmed that Plaintiff would not have acquired skills in PRW that would transfer to work at the sedentary exertional level. *Id.* The ALJ asked the VE what percentage of time off-task in addition to customary breaks would eliminate work. Tr. at 1290. The VE testified that if the individual were off task more than 10% of the day, in addition to normal breaks, all work would be eliminated. *Id.*

The ALJ asked the VE to identify the pattern of absenteeism that would preclude work. Tr. at 1291. The VE testified that two or more absences per month would eliminate all work. *Id.* She confirmed that if the individual had a substantial loss in her ability to perform just one of the basic mental demands for unskilled work, all jobs would be eliminated. Tr. at 1292.

c.     Witness Testimony

i.     February 5, 2019

Plaintiff's daughter Sheryl Priest ("Mrs. Priest") testified at the hearing on February 5, 2019. Tr. at 91–95. She stated she had worked as a paralegal in a law firm for four years. Tr. at 91. She said Plaintiff had lived with her since her injury in 2016. Tr. at 92. She explained that Plaintiff had been very active prior to her injury through working, gardening, cooking, shopping, and going out to eat. *Id.* She stated Plaintiff was no longer able to engage in those activities. *Id.*

Mrs. Priest said Plaintiff had required her assistance to bathe when she first moved in. *Id.* She said it was difficult for her to make plans because Plaintiff's ability to participate was dependent on her pain and mood. Tr. at 92–93. She said Plaintiff could not go shopping and had difficulty visiting the grocery store. Tr. at 93. She indicated Plaintiff required a wheelchair or motorized cart and was easily exhausted. *Id.* She said Plaintiff could not remain in one position and could only spend 10 to 15 minutes cooking. *Id.*

Mrs. Priest indicated she would prepare Plaintiff's breakfast and medications prior to leaving for work and would pick up any items Plaintiff needed prior to returning home in the evening. *Id.* She said she had to write down reminders because Plaintiff could not remember things. *Id.* She noted Plaintiff would start a task like cooking, feel tired, and walk away without

51

turning off the stove. Tr. at 94. She said Plaintiff sometimes left the faucet running in the bathroom. *Id.* She stated Plaintiff was more mobile, but very tired after taking Hydrocodone. *Id.*

ii.     September 23, 2021

During the second hearing, Mrs. Priest testified she had installed cameras in her house after multiple incidents in which Plaintiff had failed to turn off the gas or electricity after using them. Tr. at 731. She said the cameras allowed her to monitor Plaintiff from work and make sure she was safe. *Id.* She indicated Plaintiff's memory was terrible and she often had to repeat things two or three times before Plaintiff would respond. *Id.*

Mrs. Priest testified she had taken Plaintiff to the ER because she was having difficulty breathing. Tr. at 732. She indicated Plaintiff had followed up with PA Gilbert, who had ordered a home sleep study. *Id.* She stated Plaintiff had subsequently followed up with Dr. Benjamin, who had confirmed a diagnosis of sleep apnea and the need for a CPAP machine. *Id.*

Mrs. Priest indicated she helped Plaintiff dress because numbness in her feet prevented her from dressing on her own. Tr. at 733. She said she woke Plaintiff each morning, made her breakfast, gave her medication, and talked with her. *Id.* She stated a neighbor would check on Plaintiff during the day. *Id.* She said she returned at lunchtime to deliver Plaintiff's lunch and administer her medications. *Id.* She indicated she or her husband would cook

dinner and bring it to Plaintiff in her room because she was mostly bedridden. *Id.* She testified she helped Plaintiff shower after dinner because she had slipped on several occasions and could no longer shower on her own or without using a shower chair. Tr. at 734.

Mrs. Priest stated Plaintiff used a cane to ambulate because she had fallen. *Id.* She noted Plaintiff limped, dragged her feet, and hunched over while walking. *Id.* She said Plaintiff was incapable of bending down to pick up items from the ground. Tr. at 735.

Mrs. Priest indicated Plaintiff's health had worsened over the prior year. *Id.* She stated Plaintiff was less mobile and could no longer prepare simple foods. *Id.*

2.    The ALJ's Findings

In his decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.
2.    The claimant has not engaged in substantial gainful activity since May 31, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    Since the alleged onset date of disability, May 31, 2016, the claimant has had the following severe impairments: lumbar degenerative disc disease (DDD) (20 CFR 404.1520(c) and 416.920(c). As of the established onset date of disability, June 12, 2022, the claimant has had the following severe impairments: lumbar degenerative disc disease, depression and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4. Since May 31, 2016, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that prior to June 12, 2022, the date the claimant became disabled, the claimant had the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant can occasionally climb ramps and stairs, as well as occasionally balance, stoop, kneel, and crouch. She can never crawl or climb ladders, ropes, or scaffolds. She can never work at unprotected heights. She can occasionally operate foot controls with her right foot; and, within the assigned exertional level, push and/or pull on an occasional basis with her right lower extremity. She can occasionally reach overhead with her bilateral upper extremities. The claimant can frequently reach all other directions, handle, finger, and feel, with her bilateral upper extremities. She can never work at unprotected heights and never operate a motor vehicle as an occupational requirement. The claimant must avoid concentrated exposure to extreme cold, extreme heat, and avoid concentrated exposure to tools and work processes that would expose her right lower extremity on a concentrated basis to vibration. The claimant's time off task needs can be accommodated through ordinary breaks.

6. After careful consideration of the entire record, the undersigned finds that since June 12, 2022, the claimant has had the residual functional capacity to perform less than the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). The claimant can occasionally climb ramps and stairs, as well as occasionally balance, stoop, kneel, and crouch. She can never crawl or climb ladders, ropes, or scaffolds. The claimant would require the use of a handheld assistive device in the nature of a cane for prolonged ambulation for ascending and descending slopes and for transversing over uneven terrain. She can never work at unprotected heights. She can occasionally operate foot controls with her right foot; and, within the assigned exertional level, push and/or pull on an occasional basis with her right lower extremity. She can occasionally reach overhead with her bilateral upper extremities. The claimant can frequently reach all other

directions, handle, finger, and feel, with her bilateral upper extremities. She can never work at unprotected heights and never operate a motor vehicle as an occupational requirement. The claimant must avoid concentrated exposure to extreme cold, extreme heat, and avoid concentrated exposure to tools and work processes that would expose her right lower extremity on a concentrated basis to vibration. She is able to perform simple, routine tasks and make simple work-related decisions with regard to use of judgment and dealing with changes in the work setting. The claimant's time off task needs can be accommodated through ordinary breaks.

7.  Prior to June 12, 2022, the claimant was capable of performing past relevant work as a waitress. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

8.  Beginning on June 12, 2022, the claimant's residual functional capacity has prevented the claimant from being able to perform past relevant work (20 CFR 404.1565 and 416.965).

9.  Beginning on June 12, 2022, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

10. The claimant was not disabled prior to June 12, 2022, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g

11. The claimant was not under a disability within the meaning of the Social Security Act at any time through December 31, 2017, the date last insured (20 CFR 404.315(a) and 404.320(b)).

Tr. at 1190–1211.

II.  Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  the ALJ failed to properly evaluate her subjective allegations of symptoms; and

2)    the ALJ did not explain the RFC assessment in accordance with SSR 96-8p.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

56

impairment meets or equals an impairment included in the Listings;[6] (4) whether such impairment prevents claimant from performing PRW;[7] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the

---

[6] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[7] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are

supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Subjective Allegations

Plaintiff argues the ALJ failed to evaluate her subjective symptoms in accordance with 20 C.F.R. § 404.1529 and § 416.929 and SSR 16-3p. [ECF No. 23 at 15]. She asserts the ALJ conceded her medically-determinable impairments could reasonably be expected to produce "some" of her alleged symptoms, but failed to explain which of her alleged symptoms her impairments could reasonably be expected to produce. *Id.* at 16. She maintains the ALJ erred in rejecting her subjective allegations based on a lack of objective medical evidence. *Id.* at 16–17. She submits the ALJ should not have interjected his lay opinion that "it would be reasonable to expect that later radiological monitoring and a later in time surgical consultation would have been offered and accepted" if "the later 2018 MRI study was indicative of 'objective evidence of concern and worsening to support the totality of symptoms objectively presented.'" *Id.* at 17–18. She contends the ALJ did not explain which of her ADLs were consistent with the RFC assessment. *Id.* at 18–19.

The Commissioner argues substantial evidence supports the ALJ's evaluation of Plaintiff's subjective allegations. [ECF No. 24 at 19]. He maintains the ALJ pointed to "multiple, specific reasons, tied to the record, to support his findings." *Id.* He submits the ALJ explained that the objective

medical evidence and Plaintiff's treatment history supported the RFC assessment *Id.* at 19–22. He maintains the ALJ was not required to explain which of Plaintiff's ADLs were consistent with the RFC assessment because he did not consider the ADLs themselves, but Plaintiff's report to her pain management providers that her medication treatment plan was working well and she was able to function better with ADLs. *Id.* at 21 n.3.

"[A]n ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)); *see also* 20 C.F.R. § 416.929(b), (c). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)); *see also* 20 C.F.R. § 416.929(b). If he concludes the claimant's impairment could reasonably produce the symptoms she alleges, he proceeds to the second step, which requires him to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)); *see also* 20 C.F.R. § 416.929(c).

An ALJ "improperly increase[s]" the claimant's "burden of proof" where he requires the subjective description of symptoms to be verified by objective medical evidence. *Lewis*, 858 F.3d at 866. Thus, if an ALJ concludes a

claimant has severe impairments that could reasonably cause the symptoms she alleges, the ALJ cannot reject the functional limitations the claimant alleges simply because there are not enough clinical signs and laboratory findings to corroborate the allegations.

Upon proceeding to the second step, the ALJ must consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). In undertaking this inquiry, the ALJ should consider "statements from the individual, medical sources, and any other sources that might have information about the claimant's symptoms, including agency personnel," as well as: (1) the claimant's ADLs; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures the claimant uses or has used to relieve pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p; 20 C.F.R. §§ 404.1529(c)(3), (4), 416.929(c)(3), (4).

The ALJ must explain which of the claimant's alleged symptoms he considered "consistent or inconsistent with the evidence in [the] record and how [his] evaluation of the individual's symptoms led to [his] conclusions." SSR 16-3p, 2017 WL 5180304, at *8. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10. The ALJ must "build an accurate and logical bridge" between the evidence and his conclusion as to the intensity, persistence, and limiting effects of the claimant's symptoms. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

The ALJ recited the allegations in Plaintiff's testimony and function reports and wrote: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully supported prior to June 12, 2022." Tr. at 1195–96. Although the ALJ stated Plaintiff's impairments could be reasonably expected to cause "some" of her alleged symptoms, the undersigned interprets this as meeting the first step of the analysis in 20 C.F.R. § 404.1529(b) and (c) and § 416.929(b) and (c), because the ALJ's

challenge is to Plaintiff's characterization of the intensity, persistence, and limiting effects of the her symptoms, not to the fact that Plaintiff's lumbar DDD could reasonably cause pain and other symptoms.

The ALJ noted Plaintiff "was polite and cooperative at her hearing; testifying as to her personal beliefs as to why she believes she is eligible for the benefits applied for an under consideration at her hearing." Tr. at 1205. He wrote:

> There are positive findings that somewhat support some of the claimant's subjective symptoms and reported limitations; including some consideration to radiological studies, including but not limited to the aforementioned lumbar spine MRI studies. While the medical evidence of record establishes the existence of the above-mentioned impairments, the objective findings do not confirm that these impairments are of such a severity that they could reasonably be expected to produce the degree of functional limitations alleged. The claimant's reports of pain are inconsistent with objective findings. For example, she complained of radicular symptoms into her leg/ankle, but the EMG/NCS of her right lower extremity was normal (Exhibit 16F). She has been treated conservatively with injections, physical therapy, and long-term opiates. Furthermore, the claimant's testimony that she used a cane for 4 years is not supported by the evidence of record. Similarly, her testimony that she is "fatigued all the time" is inconsistent with notes from Dr. Parker, which state the contrary (Exhibit 30F). Accordingly, a finding that the claimant was incapable of all work activity, prior to June 12, 2022, is not supported by the evidence of record, for the reasons explained above.

*Id.*

The record supports the ALJ's notation of inconsistencies between Plaintiff's statements and the objective evidence. In particular, he correctly

concluded the record did not support Plaintiff's testimony regarding the period she had used a cane consistently or experienced fatigue.

However, the court cannot ignore the ALJ's insertion of his lay opinion in characterizing the diagnostic imaging and its implications. An ALJ is not permitted to "play doctor" and substitute his lay opinion for that of a physician merely because he disagrees with the physician's opinion. *See Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

In the prior order remanding the case, the court noted that ALJ's failure to consider the 2018 MRI results and wrote the following:

> [The ALJ] cited the prior MRI, EMG, and NCS results as objective evidence that failed to support Plaintiff's allegations of LE radicular symptoms. However, she did not acknowledge that the "protrusion projecting into the spinal canal closely approximating the transiting L5 nerve roots" shown on the September 22, 2018 MRI of Plaintiff's lumbar spine arguably serves as objective evidence supporting her allegations of LE radicular symptoms.

Tr. at 1389.

Here, the ALJ discussed the diagnostic imaging, including the 2018 MRI report, and Dr. Parker's interpretation of the MRIs, writing:

> On July 3, 2018, the claimant was diagnosed with mild right carpal tunnel syndrome confirmed by EMG. EMG nerve conduction study of the right lower extremity results were all normal. There was no evidence of myopathy, plexopathy, peripheral neuropathy, or lumbar nerve root irritation noted (Exhibit 16F).

On September 22, 2018, the claimant underwent an MRI of her lumbar spine without contrast, which demonstrated a protrusion at L4-5 that projected into the spinal canal and closely approximated the transiting L5 nerve root, more so on the left than the right. There was a tiny tear in the peripheral annular fibers at and slightly to the right of midline. It also indicated loss of the normal lumbar lordosis and a mildly transitional appearance (Exhibits 13F, 17F/24, 25). Notably, in discussing claimant's previous MRI (performed July 25, 2016), it was felt that surgical intervention was not indicated. The findings then were described as a small degenerative disc bulge at the L4/5 level without any significant central or foraminal stenosis; the reviewing physicians, Drs. Kimberly A. Cecchini-Purgavie and Wayne Bauerle, noted they did not see any evidence of nerve root involvement and in fact, according to Dr. Cecchini-Purgavie, the physical examination and reported symptoms did not match the MRI findings (Exhibit 4F/3-4/10). The actual MRI is exhibited at 4F/17. As with the later 2018 MRI, the findings of consequence were limited to the L4/L5 level; neither MRI was performed with contrast. According to the radiology report from 2016 the findings included: a "broad-based circumferential disc bulge" with a central annular tear; without significant compressive sequela. It was noted that the nerve roots demonstrated normal signal characteristics. Comparing the 2016 findings with the 2018 findings, there appears to be a slight but inconsequential difference in findings when the medical evidence of record as a whole is considered in the relevant time periods; specifically the symptom patterns and clinical examination findings available in the record. First, the effected level in the lumbar spine remains at L4/L5. The annular tear is noted; though in the 2018 MRI the tear is specifically described as "tiny." Rather than the earlier description of a broad-based central disc bulge, the 2018 report describes a "mild annular protrusion projecting into the spinal canal closely approximating the transiting L5 nerve roots more so left than right." It is significant to note that the 2018 finding indicates a protrusion "closely approximating" the L5 nerve root but does not describe an actual herniation or actual compressive effect with specificity on the identified nerve root. Significantly, and as discussed above, on July 3, 2018, a few weeks before the 2018 MRI, the claimant underwent an EMG nerve conduction

study of the right lower extremity, and the results were all normal. There was no evidence of myopathy, plexopathy, peripheral neuropathy, or lumbar nerve root irritation noted (Exhibit 16F). The reports themselves do not provide clear evidence as to whether there is a distinct and consequential finding of a worsening as of the 2018 MRI; or that the finding explains and provides support or a probative explanation for the lack of consistency with regard to reported symptoms and functional loss as found in clinical examination notes and discussed in this decision. There is no indication that a radiologist or other physician compared and discussed the 2 studies upon completion of the 2018 MRI. Dr. Parker in his letter of November 22. 2023 noted that the MRI studies reviewed were consistent. He noted further that disc bulges sometimes attempt to repair themselves on their own; and noted that "[t]he disc bulge was resolving to some limited degree, but it was still enough to cause nerve protrusion, compressing the nerve root." He noted that claimant's complaints of pain are consistent with the MRIs and his diagnosis ((Exhibit 35F/2). Dr. Parker did not include in his assessment the extent with specificity as to any "nerve protrusion." Significant to note, and as is discussed throughout this decision, is that both before and after the 2018 MRI study, the lack of evidentiary support to explain the lack of consistency in reporting of symptoms and functional limits versus clinical examination findings continued; even if there is some level of finding provided by the later MRI relative to radicular leg symptoms. More importantly, and supportive of this conclusion, is the reasonable assumption that if the later MRI study was indicative of objective evidence of concern and worsening to support the totality of symptoms subjectively presented in the relevant periods, then it would be reasonable to expect that later radiological monitoring and a later in time surgical consultation would have been offered and accepted. That did not occur; nor, as noted in the detailed discussion of the medical evidence from the alleged onset of disability to the established onset of disability date, is there evidentiary sustainability to cure the inconsistencies between the claimant's reports of symptoms and functional loss and the clinical examination findings and effects of treatment as discussed throughout this decision.

Tr. at 1198–99.

It is important to note that Dr. Parker was the only physician to review and interpret the 2018 MRI of Plaintiff's lumbar spine. While the ALJ referenced Dr. Bauerle's impression of the 2016 MRI results and Dr. Cecchini-Purgavie's impression that those MRI results were not consistent with Plaintiff's complaints, neither Dr. Bauerle nor Dr. Cecchini-Purgavie examined Plaintiff after July 2018 or reviewed the September 2018 MRI results. In the excerpt above, the ALJ argued the diagnostic evidence and treatment record failed to support Dr. Parker's explanation, but his argument is based on his speculation and lay interpretation of the medical evidence. Therefore, the undersigned recommends the court find the ALJ impermissibly played doctor in contravention of the applicable regulations and rulings.

Because the ALJ based his assessment of Plaintiff's subjective allegations primarily on his interpretation of the diagnostic imaging, he failed to consider other evidence relevant to her pain. The undersigned agrees with the Commissioner that the ALJ's reference to Plaintiff's ability to complete ADLs was taken from notations in Dr. Parker's records. However, the ALJ did not consider the nature and extent of the ADLs Plaintiff reported she was able to perform, a factor relevant to evaluation of her pain allegations. *See* SSR 16-3p; 20 C.F.R. § 404.1529(c)(3), (4). He further failed to address and either credit or discredit Plaintiff's reports that her pain was

aggravated by prolonged sitting, standing, and walking and that she shifted positions to relieve pain. *See id.* The ALJ also neglected to address the observations of several providers regarding physical manifestations of Plaintiff's pain. *See, e.g.*, Tr. at 398 and 406 (indicating Plaintiff was very slow in performing activities due to pain and apprehension), 951 (noting Plaintiff cried in frustration and was unable to perform multiple exercises due to pain), 955 (indicating Plaintiff grimaced in pain during the physical therapy session), 960 (observing Plaintiff moved slowly, was unable to progress to SLR on the right, had significant weakness to her RLE, and grimaced throughout the majority of physical therapy treatment). In neglecting this evidence, the ALJ did not fully comply with 20 C.F.R. § 404.1529 and § 416.929 and SSR 16-3p.

Therefore, the undersigned recommends the court find the ALJ erred in evaluating Plaintiff's statements as to the intensity, persistence, and limiting effects of her pain. The undersigned further recommends that if the ALJ declines to accept Dr. Parker's interpretation of the 2018 MRI and its limiting effects on remand, he obtain testimony from a medical expert as to the 2018 MRI results and the symptoms that could reasonably be anticipated based on its findings.

2.    RFC Assessment

Plaintiff argues the ALJ did not explain the RFC assessment in accordance with SSR 96-8p. [ECF No. 23 at 19]. More specifically, she maintains the ALJ did not explain how the evidence supported a finding that she could meet the standing and walking requirements of light work or why he later limited her to sedentary work based only on the addition of severe mental impairments. *Id.* at 21. She contends the RFC for light work is inconsistent with the ALJ's acknowledgment of her "issues with walking/muscle weakness" and his statement that he had considered these issues in the RFC assessment. *Id.* at 22. She asserts the ALJ's failure to consider her lower extremity weakness was prejudicial, as the Medical-Vocational Guidelines would have directed a finding that she was disabled if he had limited her to sedentary work. *Id.* at 23. She claims the ALJ failed to consider evidence that supported an earlier onset of her severe mental impairments. *Id.* at 23–25.

The Commissioner argues the ALJ carefully reviewed the record and provided ample support for his finding that Plaintiff could perform light work prior to June 12, 2022, and only sedentary work thereafter. [ECF No. 24 at 19]. He asserts the ALJ explained that positive objective findings, including the MRIs, supported some of Plaintiff's allegations, whereas other objective evidence did not support her alleged pain severity. *Id.* at 25. He maintains

70

the ALJ relied on Plaintiff's conservative treatment history that included injections, physical therapy, and long-term opiates. *Id.* He notes the ALJ cited physicians' conclusions that Plaintiff was not a surgical candidate and that her symptoms were not consistent with the objective evidence. *Id.* He points out the ALJ cited evidence in the record that conflicted with Plaintiff's testimony that she had used a cane for four years and was "fatigued all the time." *Id.* He contends the ALJ pointed to a worsening of physical and mental impairments beginning in June 2022 that supported the later onset date of disability. *Id.* at 26–27. He asserts Plaintiff's testimony and her counsel's statements during the hearing refute an earlier onset of severe mental impairments. *Id.* at 27.

A claimant's RFC represents the most she can still do, despite limitations imposed by her impairments and symptoms. 20 C.F.R. §§ 404.1545(a), 416.945(a). In assessing a claimant's RFC, the ALJ should engage in a function-by-function review of the claimant's physical, mental, sensory, and other work-related abilities, considering the specific functions affected by the claimant's impairments and including appropriate restrictions in the RFC assessment to address her limitations. SSR 96-8p, 1996 WL 374184, at *1.

The ALJ must support the RFC assessment with a narrative discussion describing how all the relevant evidence in the case record supports each

conclusion and must cite "specific medical facts (*e.g.*, laboratory findings) and non-medical evidence (*e.g.*, daily activities, observations)." *Id.* at *7 (1996). He must explain how material inconsistencies or ambiguities in the record were considered and resolved. *Id.* "An ALJ has an obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis*, 858 F.3d at 869. In *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), the court stated "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review."

The ALJ found that prior to June 12, 2022, Plaintiff had the RFC to perform a reduced range of work at the light exertional level, which "involves lifting no more than 20 pounds at a time with frequent lifting or carry of objects weighing up to 10 pounds, as well as sitting, standing, or walking for 6 hours each in an 8-hour workday" and "push[ing] and pull[ing] as much as she can lift and carry." Tr. at 1192–93 n.2.

The ALJ found the state agency medical consultants' opinions that Plaintiff was capable of light work with additional postural restrictions somewhat persuasive in assessing the initial RFC for light work. Tr. at 1203. He noted the consistency of their opinions with assessments that showed

Plaintiff to have normal gait and strength, intact cranial nerves, and no difficulty walking when she was examined by Dr. Cheatle. *Id.*

The ALJ considered persuasive the state agency psychological consultants' opinions that Plaintiff did not have a medically determinable mental impairment at the times they examined the record. *Id.* He noted consistency between their opinions and Plaintiff's having denied anxiety and depression to Dr. Parker on July 18, 2017, August 15, 2017, October 17, 2017, and January 16, 2018. *Id.* He further wrote: "There are no mental health complaints in the longitudinal case records, and by the claimant's own admission, she began experiencing depression 3 months before her latest hearing (Exhibits 2A, 4A, 8A, 10A)." Tr. at 1204.

The ALJ discussed the abnormalities Dr. Jones noted during her exam, but found her impressions were "not consistent with the other evidence of record." *Id.* He cited a July 3, 2018 assessment of full lower extremity strength and an August 6, 2021 description of Plaintiff as walking without assistance, demonstrating full range of motion and normal sensation throughout, and having an essentially unremarkable physical exam. *Id.*

The ALJ recounted multiple opinions rendered by Dr. Parker and found them unpersuasive because they were inconsistent with the medical evidence and his office notes that indicated Plaintiff "had good relief from injections, and was able to perform activities of daily living with her treatment plan."

73

Tr. at 1204–05. He noted: "The claimant's reviews of systems indicates that she had some issues with walking/muscle weakness, this has been accounted for in the residual functional capacity (Exhibit 18F)." Tr. at 1204. He cited the August 6, 2021 records from Grand Strand Regional Hospital that described Plaintiff "as able to walk without assistance" with "full range of motion throughout," an "essentially unremarkable" physical exam, normal sensation throughout, and an "unremarkable" mental status examination. *Id.*

The ALJ wrote:

> The undersigned does not mean to imply that the claimant was perfectly healthy and without symptoms and some limitations; but rather, she was not totally debilitated or disabled within the context of the Social Security Act for the relevant period prior to the established onset of disability date found herein.

*Id.*

The ALJ subsequently determined that since June 12, 2022, Plaintiff has had the RFC to perform less than the full range of sedentary work involving "simple, routine tasks" and "simple work-related decisions." Tr. at 1205–06. He noted the change in RFC was supported by additional severe impairments of depressive disorder and anxiety disorder that resulted in a mild limitation in understanding, remembering, or applying information, a mild limitation in interacting with others, a moderate limitation in concentrating, persisting, or maintaining pace, and a mild limitation in adapting or managing oneself. Tr. at 1206. He further indicated the reduced

RFC reflected Plaintiff's ambulation with a cane and complaints "of worsening right foot hypoesthesia and developing left foot hypoesthesia . . . affecting her ADLs," her recent diagnoses of COPD and diabetes, prescriptions for Prednisone dose packs to address symptom exacerbation, and recent records that reflected complaints of recurrent knee and right thigh pain, reports of near syncope, and increased mental symptoms. Tr. at 1206–08.

The undersigned agrees with the ALJ's finding that the more recent records are indicative of a worsening of DDD and new diagnoses of depression, anxiety, diabetes, and COPD and that this evidence supports even greater limitations. Although Plaintiff endorsed some symptoms of depression and anxiety in earlier records, those earlier records fail to reflect consistent and ongoing complaints or treatment. The ALJ supported his conclusion that Plaintiff's mental impairments were not severe prior to June 2022 with references to the medical record, Plaintiff's prior reports, and her testimony.

While the undersigned finds substantial evidence supports the ALJ's conclusion that Plaintiff developed additional impairments and symptoms in and after June 2022 that further limited her ability to work, the undersigned cannot conclude substantial evidence supports the ALJ's RFC assessment prior to this date. The ALJ's explanation does not permit the court to discern

how the relevant evidence supports the restrictions included in the RFC assessment and fails to support greater restrictions. Although the ALJ pointed to observations of normal LE strength and gait and Plaintiff's failure to present to some appointments with a cane, he did not explain how this evidence supported a finding that Plaintiff could sit, stand, or walk for up to six hours each per day. The ALJ also failed to reconcile his conclusion that Plaintiff could perform light work with the 10-pound lifting restrictions Dr. Bauerle and Dr. Parker indicated. *See, e.g.*, Tr. at 668, 673, 470, 472.

Despite having acknowledged Plaintiff's "issues with walking/muscle weakness" and stating he accommodated this in the RFC assessment, the ALJ found Plaintiff could stand for up to six hours per day without further restriction. As noted above, the ALJ did not resolve inconsistencies and ambiguities in the record as to Plaintiff's statements regarding the effects of her pain on her sitting, standing, and walking abilities, and need to alternate positions frequently.

The disability decision turns critically on whether Plaintiff was limited to sedentary or light work during the relevant period. If the ALJ had found that Plaintiff was restricted to sedentary work on or after her fiftieth birthday, Medical-Vocational Rule 201.14 would have directed a finding that she was disabled given her age, education, and the VE's testimony that her PRW failed to produce skills transferable to the sedentary exertional level.

*See* 20 C.F.R. Part 404, Subpart P, App'x 2, § 201.14; *see also* Tr. at 1289 (VE testimony reflecting no transferable skills to sedentary work).

Given the ALJ's failure reconcile all the relevant evidence and thoroughly explain his findings, the undersigned recommends the court find the RFC assessment is not supported by substantial evidence.

### 3.    Type of Remand

Plaintiff requests the court reverse the Commissioner's decision and award her benefits. [ECF No. 23 at 26]. In the alternative, she requests the court reverse the Commissioner's decision and remand the case for further administrative proceedings. *Id.*

The Fourth Circuit has explained that it is appropriate for a court to reverse a case without remanding the cause for rehearing "where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no useful purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974). In a subsequent case, the court reversed the Commissioner's decision and remanded the case for an award of benefits where "the ALJ's decision contained numerous fundamental errors and was not supported by substantial evidence" and the plaintiff "presented clear and convincing proof . . . as a matter of law." *Veeney ex rel. Strother v. Sullivan*, 973 F.2d 326, 333 (4th Cir. 1992) (citing *Sahara Coal Co. v. Director, OWCP,*

946 F.2d 554, 558 (7th Cir. 1991) ("If the outcome of a remand is foreordained, we need not order one.")). An award of benefits is appropriate when "a remand would only delay the receipt of benefits while serving no useful purpose, or a substantial amount of time has already been consumed." *Davis*, 2008 WL 1826493, at *5 (citing *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984)); *Tinnant v. Schweiker*, 682 F.2d 707, 710 (8th Cir. 1982).

"On the other hand, remand is appropriate 'where additional administrative proceedings could remedy defects . . . .'" *Id.* (quoting *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989)). In *Radford v. Colvin*, 734 F.3d 288, 294–95 (4th Cir. 2013), the Fourth Circuit found the district court had chosen the "wrong remedy" in remanding the case with instruction to award benefits. It explained: "If the reviewing court has no way of evaluating the basis for the ALJ's decision, then 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Id.* at 295 (citing *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). It concluded the district court had abused its discretion in directing an award of benefits and considered remand for further proceedings before the agency appropriate "[g]iven the depth and ambivalence of the medical record" and "the ALJ's failure to adequately 'explain his reasoning." *Id.* at 295–96. In *Carr v. Kijakazi*, C/A No. 20-2226, 2022 WL 301540, at *5

(4th Cir. Feb. 1, 2022), the court noted that only in rare cases is it "clear that an ALJ decision denying benefits, properly explained, could not be supported by substantial evidence in the record." This decision dictates that district courts only rarely exercise their discretion to remand claims for awards of benefits.

Because the record in this case may reasonably be supplemented with additional evidence and explanation, the undersigned finds a remand for further administrative proceedings to be the appropriate remedy. On remand, Plaintiff shall have the opportunity to supplement the record with any additional relevant evidence and the ALJ shall provide Plaintiff an opportunity for a new hearing and obtain testimony from medical and vocational experts, as needed.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. §

405(g), that this matter be reversed and remanded for further administrative proceedings.

    IT IS SO RECOMMENDED.

February 28, 2025                    Shiva V. Hodges
Columbia, South Carolina           United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

## Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).